

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

MICHAEL WOODLEY,                    )
                                   )
            Plaintiff,             )    Case. No. 07 C 500
        v.                         )
                                   )    Magistrate Judge
MICHAEL J. ASTRUE, Commissioner    )    Arlander Keys
of Social Security,                )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND ORDER

Michael Woodley, now 49 years old, suffers from pain and
swelling in both knees. He alleges that these impairments
prevent him from working. On January 5, 2004, he applied to the
Social Security Administration ("SSA") for Disability Insurance
Benefits ("DIB") and Supplemental Security Income ("SSI"), but
the SSA denied his application. After unsuccessfully pursuing an
appeal through the SSA's processes, Mr. Woodley filed suit in
this Court, seeking review of the decision to deny him benefits.
The case is before the Court on cross motions for summary
judgment; Mr. Woodley seeks a reversal or remand of the
Commissioner's decision to deny benefits, and the Commissioner
seeks summary judgment affirming his decision to deny benefits.

## Facts & Procedural History

Michael Woodley applied for DIB and SSI on January 5, 2004,
claiming that, as of December 27, 2001, he was unable to work due

to "bad knees"; he claimed that because of his knees, it was hard for him to walk and move his legs. Record at 75-77, 105-106. He also listed ulcers as a condition that limited his ability to work, though he never provided further details regarding the impact of the ulcers on his employment. Record at 105. The SSA denied his claim initially on May 24, 2004, and upon reconsideration on January 3, 2005. Record at 30-33, 36-38. After he requested a hearing, his case was assigned to ALJ Alan L. Jonas, who held the requested hearing on December 12, 2005. Record at 312.

At the hearing before the ALJ, Mr. Woodley, who was represented by counsel, testified first. Record at 316. In response to questions from the ALJ, Mr. Woodley testified that he lived with his mother, who was in poor health, suffering from arthritis, asthma, bad knees, high blood pressure and other problems. Record at 316. Mr. Woodley testified that he assisted his mother by going to the store for her. Record at 316-317. He testified that he walked approximately one block to the store about three times a day. Record at 317. When the ALJ asked why he visited the store so often, Mr. Woodley testified that he did so because his mother "forgets things." Record at 317. Mr. Woodley's attorney asked whether he actually went to the store 3 times a day and therefore 21 times a week. Record at 326. He

2

testified that he only shopped at the store for "little stuff" and did so about seven times each week. Record at 326.

With respect to his past work experience, Mr. Woodley testified that he last worked in 2001 as a stockman at the Dollar Tree, a retail store. Record at 318. He testified that he worked at the Dollar Tree for four hours a day, four days a week for three months. Record at 318. When asked by the ALJ why he stopped working, he said, "Not enough hours, and my knees." Record at 318.

When Mr. Woodley's attorney asked why he cannot work, he testified that "jobs won't let [him] work the hours." Record at 328. When asked for clarification to this response, Mr. Woodley testified that he cannot stand for eight hours, and he can only sit for a couple hours. Record at 328. He testified that he cannot make it through eight hours without lying down or elevating his legs because of the pain. Record at 328. He also testified that employers were unlikely to allow him to take the necessary time off for doctors' appointments. Record at 328.

With respect to his impairments, Mr. Woodley testified that he had problems with both knees, but that his left was worse. Record at 319. He testified that his knees hurt every day and swell every other day. Record at 318. He testified that the swelling occurs when he stands on his feet for too long. Record

at 318. Mr. Woodley testified that he uses medications, a heat pad, and an ice pad to treat the pain and swelling. Record at 319.

When asked about his medications, Mr. Woodley proffered to the ALJ a host of bottles containing a variety of pain medications, including Ibuprofen, Naproxen, Tramadol HCL, and Tylenol with Codeine. He also proffered Rabeprazole, which Mr. Woodley explained was for his stomach condition. Record at 320. After examining these medications, the ALJ noted on the record that some of the bottles showed prescriptions that were expired and other bottles appeared to be nearly full, suggesting that the medication had been untouched. Record at 320-321. In response to the ALJ's comments, Mr. Woodley testified that he had not taken much of the Naproxen because it did not help alleviate his symptoms, and that the Tramadol was unused because he had visited different doctors and received different types of medicines. Record at 321-322. Mr. Woodley testified that he had taken roughly 30 tablets of Tylenol with codeine after surgery in 2004; in response, the ALJ noted that the prescription allowed for two refills, which did not appear to have been filled. Record at 323. When the ALJ asked about another bottle of Tylenol that appeared to be only partially used, Mr. Woodley testified that it had been a while since he last used the medication. Record at

4

323. The ALJ asked Mr. Woodley whether he had been taking any medications at all, and, in response, Mr. Woodley testified that "they don't do any good, sir." Record at 323.

Mr. Woodley testified that, beyond the medications, he had received steroid injections in his knees on about three occasions; he testified that the shots provided relief for a couple of weeks. Record at 325. He testified that he was scheduled to receive more shots within two months of the hearing, and that he had, in fact, received shots from the Veterans Hospital within a few months prior to the hearing. Record at 324. He also testified that he had done some physical therapy, but not for some time; he testified that he last attended physical therapy more than ten months before the hearing. Record at 324-325. When his attorney asked why he no longer attended physical therapy, Mr. Woodley testified that his doctor said the physical therapy was finished, and that he instructed him to continue his exercises at home. For example, he was instructed to do exercises requiring him to bend his knees; he testified, however, that he could not bend his knees. Record at 326.

With respect to his daily activities, Mr. Woodley testified that he had problems sitting for more than two hours, after which he needed to stretch his legs or lie down due to pain. Record at 325. Mr. Woodley testified that he spent four to five hours a

5

day elevating his legs to avoid pain in his knees. Record at 326-327. He testified that he spent six to eight hours each day lying down to further alleviate the pain. Record 327. Mr. Woodley testified that his doctors had recommended replacing both knees, but he had declined because he did not want to endure additional surgeries. Record at 327-328.

Prompted by a question from the ALJ, Mr. Woodley testified that he lies down six to eight hours in addition to sleeping for four to five hours each day. Record at 329. The ALJ's questioning of Mr. Woodley included the following exchange:

ALJ: So if you elevate your legs for four to five hours a day and you lie down for six to eight hours a day and you sleep for four to five hours at night, that doesn't leave much time for being up and around, does it?
Woodley: No.
ALJ: Just enough time to get to the store three times a day; is that it?
Woodley: Yes. Record at 329.

After Mr. Woodley testified, the ALJ heard from Linda Gels, a vocational expert ("VE"). Record at 329. The VE testified about Mr. Woodley's work history, noting that much of the work history reports in Mr. Woodley's Social Security Disability applications did not include a full description of employment dates or physical demands. Record at 330-333. According to the VE, Mr. Woodley's longest job was working as a machine operator

6

for four months in 1998, which required four hours each of walking and standing and lifting of up to 50 pounds.[1] Record at 330. Mr. Woodley also worked as a mailing and printing machine operator, which the VE testified would likely be classified as medium exertion and unskilled. Record at 330. Mr. Woodley's work history also included an assembly line production worker for fabric softener and picture frame manufacturers, both of which, according to the VE, were probably classified as light exertion and unskilled. Record at 331-333. The VE described Mr. Woodley's other jobs as a houseman and housekeeper in hotels, which qualify as light and unskilled positions that require eight hours of walking per workday. The VE testified that Mr. Woodley's hotel janitor position may have been semiskilled. Record at 331. The VE described Mr. Woodley's job as a groundskeeper as between medium to heavy exertion and unskilled. Record at 331. The VE testified that Mr. Woodley twice listed temporary service jobs, which usually do not fall below light exertion. Record at 331-332. She testified that the last job on

---

[1] The VE appears to be wrong about Mr. Woodley's employment longevity. The work history reports upon which she based her testimony include an additional machine operator position that Mr. Woodley held from 1984 through at least 1990 and possibly through 1991 or 1993, depending on which work history report one accepts. Thus, his longest term of employment was at least 6 years, and possibly as long as 9 years. See Record at 81, 96, 106, 115.

7

the work history report was Mr. Woodley's stockman position at Dollar Tree, which might not qualify as substantial gainful activity because he testified that he worked there for only three months, four hours a day, four days a week. Record at 332.

The ALJ asked Mr. Woodley about the assembly line jobs, and asked if they were performed while standing or sitting. Record at 332-333. Mr. Woodley testified that they were performed while standing. Record at 333-334.

Next, the ALJ asked the VE whether, given his limitations, Mr. Woodley might be able to do other jobs. Specifically, the ALJ asked the VE to consider what jobs might be available for someone who: (1) has Mr. Woodley's work history; (2) has knee problems that render him unable to perform the standing or walking required for light work; and (3) could still do sedentary work with a sit/stand option and no other restrictions. Record at 334. The ALJ asked the VE whether jobs exist in the local, regional and national economy that such a person can perform. Record at 334. The VE testified that a person described as such can perform unskilled sedentary work, referred to as "bench work," including occupations such as assembler, tester, inspector, and hand packager. Record at 334. The VE testified that 3,500 such jobs exist in Chicago and the surrounding nine counties. Record at 334.

The VE testified that a sit/stand option may interfere with the work pace of these sedentary jobs if the employee needs to stand every ten to fifteen minutes. Record at 334. However, if the employee can sustain a posture for forty-five minutes or an hour, all 3,500 sedentary jobs should be possible. Record at 334. The VE testified that 5,000 sedentary jobs without the sit/stand option exist in Chicago and the surrounding nine counties. Record at 335.

Mr. Woodley's attorney asked the VE whether any of the 3,500 jobs allowed employees to elevate their legs during the day. In response, the VE testified that full elevation, above the heart level, was not possible, but that minimal elevation, such as resting feet upon a phone book, was unlikely to be an obstacle. Record at 335. Mr. Woodley's attorney asked whether the need to lie down during the day due to pain would affect the number of available jobs, and the VE testified that such a need would preclude virtually all employment. Record at 335.

The ALJ then concluded the hearing, but ordered the record to remain open for 28 days to allow Mr. Woodley's attorney to add updated VA records from the period July 2005 to December 2005.

In addition to the testimony given by Mr. Woodley and the VE, the ALJ considered medical records documenting Mr. Woodley's impairments. Chronologically, the medical records begin with a

radiology report signed by G.F. Carrera, MD, dated May 7, 1998 from Froedtert Memorial Lutheran Hospital ("FMLH") in Milwaukee. Based upon an examination of Mr. Woodley's left knee, Dr. Carrera identified two bone spurs on the knee. Dr. Carrera also described soft tissue swelling, which may have indicated lesions. He recommended further evaluation. Record at 142. In a second radiology report from FMLH dated May 14, 1998, Jeffrey A. Hicklin, MD and Scott J. Erickson, MD, diagnosed a traumatic ganglion cyst in Mr. Woodley's left knee, as well as mild degenerative changes and cartilage defects. Record at 145-146. A preoperative Standard History and Physical Examination record from FMLH dated July 14, 1998 and signed by R. Lusis, SMS, includes Mr. Woodley's report that he had fallen from scaffolding four years earlier and injured his left knee, causing persistent pain. Mr. Woodley reported that in the previous year, a painful mass had developed near the left knee. The medical report indicates that the staff suspected the mass to be a cyst. Record at 149.

In Mr. Woodley's Operative Report from FMLH, William Raasch, MD, describes a diagnosis of left knee medial meniscus tear, meniscal cyst, and separation of the cartilage in the knee joint. Record at 154. On July 14, 1998, Dr. Raasch performed arthroscopic surgery on Mr. Woodley's left knee; the doctor

removed tissue from the meniscus tear, removed the cyst, and generally cleaned and repaired the knee. Record 154-155.

It appears that, after his surgery, Mr. Woodley did not seek any medical treatment for almost five years. The next medical records after the surgery date from February 19, 2003, when Mr. Woodley sought treatment at the Jesse Brown Veterans Administration Medical Center-Lakeside Clinic ("VA"). The record includes progress notes from visits on February 19, 2003, March 3, 2003, and May 5, 2003. Record at 156-161. During these visits, Mr. Woodley described constant aching in his knees after his arthroscopic surgery. He reported that leg elevation and ibuprofen provided minimal relief. Record at 159. Progress notes from May 5, 2003 refer to a course of physical therapy at the Westside VA a few years earlier; there appear to be no records documenting this therapy, however. Record at 159. The May 5, 2005 progress notes include a diagnosis of bilateral patellofemoral syndrome and a recommendation that Mr. Woodley pursue physical therapy, including hot packs, stretching and exercises in order to decrease pain and stiffness, maintain range of motion, increase strength and endurance, and improve ambulation distance. Record at 160-161.

Progress notes from a kinesiotherapist at the VA, dated May 15, 2003 and May 22, 2003, show that Mr. Woodley failed to attend

11

scheduled physical therapy appointments and was subsequently
discontinued as a patient. Record at 161-162. The record shows
that Mr. Woodley went to the physical therapy department on June
2, 2003, where staff informed him about the discontinuation of
his care. He was told to await a phone call to discuss
continuation of therapy. Record at 162.

On July 22, 2003, Mr. Woodley returned to the VA complaining
of swelling in both knees. Record at 162-163, 166. On that
date, Mr. Woodley was examined by Dr. Todd Loring Johnston and
found to have moderate effusion on the right knee, tenderness,
significant crepitus (crackling or grating of the joint), and a
0-140 degree range of motion. Dr. Johnston drained Mr. Woodley's
right knee of 30cc of yellow joint fluid and provided a steroid
injection in the same knee. Record at 164. In a progress note
dated August 7, 2003, Mr. Woodley described his condition as
"pain free," although he reported right knee pain "whenever it is
cold." Record at 167. During the same visit, Mr. Woodley was
encouraged to lose weight and he was given some guidelines for
healthy living. Record at 167. Also on that date, Mr. Woodley
reported that he was "requesting disability because the only jobs
he is qualified for include walking or bending." Record at 170.

On September 12, 2003, Mr. Woodley returned to the
orthopedics department at the VA, complaining of bilateral knee

12

pain. Record at 176-178. Progress notes from this visit, include Mr. Woodley's statements that "he only has pain when walking and climbing stairs." Record at 177. According to the notes, Mr. Woodley reported using ibuprofen to provide some relief for the pain, which was located behind his kneecaps. Record at 177. Mr. Woodley also reported that he worked as a painter and noticed "that his knees swell up after prolonged kneeling." Record at 177. According to the examination report, there were no areas of tenderness, no evidence of effusion, and no joint or ligament instability; the doctor noted that an MRI had indicated patellar degeneration, however, and diagnosed patellofemoral syndrome; the doctor prescribed physical therapy two times per week for four weeks. Record at 177.

On October 7, 2003, Mr. Woodley's physical therapist provided an initial assessment that is recorded in the VA progress notes. Record at 178. During the initial assessment, Mr. Woodley stated that he used to work as a painter, and that his goal with physical therapy was to be able to return to work so that he could support his family; he stated that his level of pain prevented him from working. Record at 178. Mr. Woodley described the pain as "sharp" and "moderate intensity," and rated the pain as a 5 on a 10-point scale when walking and climbing stairs. Record at 179. Mr. Woodley reported that he could walk

one block without stopping, and, although he owned braces to support his knees, he did not use them because they made his legs sweat. Record at 179. Physical Therapist Navmar recorded short term goals to decrease pain to mild, decrease swelling and muscle shortening, and increase endurance. She established long term goals of walking three blocks with mild knee pain. Record at 179. Planned physical therapy treatment included ice pack therapy, stretching exercises, and bike riding. Record at 179. The record shows that Mr. Woodley completed four weeks of twice weekly physical therapy with Ms. Navmar, including bike riding, weightlifting exercises, stretching, and application of ice. Record 181-184. Throughout the physical therapy sessions, Mr. Woodley complained of pain in both knees and Ms. Navmar recorded swelling of his knees. Record at 182-184. Ms. Navmar also noted that Mr. Woodley tolerated the demands of physical therapy. Record at 182-184. In a note dated November 20, 2003, Ms. Navmar reported Mr. Woodley did not show up for his last physical therapy appointment. Record at 191.

On November 14, 2003, Mr. Woodley visited the VA orthopedics department, again with complaints of knee pain and swelling. Record at 185. Based on Mr. Woodley's description of persistent right knee pain, Anish Kapoor, MD, prescribed arthroscopic

surgery for diagnosis and treatment, as well as a hinged knee brace. Record at 185.

The medical record includes a handwritten letter on VA Chicago Health Care System letterhead, addressed to the Social Security Board and dated November 14, 2003. The letter, which appears to be signed by "C. Kadakia," reports that "Mr. Woodly [sic] … has meniscal tear and patellar tendinitis which severely limit his walking ability to 1-2 blocks. He will obtain a knee arthroscopy for evaluation/treatment on 12/4/03." Record at 225.

On December 4, 2003, Mr. Woodley underwent arthroscopic surgery on his right knee. Record at 194, 197-198. Donald K. Wood, Chief of Surgical Service, recorded that the surgery revealed that Mr. Woodley's right knee had degenerative changes of the knee and knee joints. As with the first surgery, which was performed on his left knee, the surgeons removed tissue. Record at 197-198. The surgery did not reveal any loose bodies or meniscal tears. The ACL was intact. Record at 197-198.

In a January 16, 2004, follow-up appointment after the surgery, Mr. Woodley asked the VA staff to complete disability papers due to knee pain and his inability to work as a painter. Record at 198. Behrang T. Mahery, MD, prescribed physical therapy and recommended no stooping and kneeling until the completion of physical therapy. Record 198-199.

15

On June 28, 2004, Mr. Woodley returned to the VA orthopedics department for a follow-up visit after his December 4, 2003 arthroscopic surgery. Progress notes from that date show that Mr. Woodley complained that his knee pain was getting worse since his last visit and that he had trouble scheduling physical therapy at the VA. Record at 199-200.

On August 9, 2004, Mr. Woodley returned to the VA with continued right knee pain. Record at 200. Progress notes record that Mr. Woodley "comes in for disability." Record at 200. Mr. Woodley stated that the surgery helped him somewhat, but reported occasional swelling of his right knee. Record at 200. The progress notes describe a range of motion from 0 to 125 and crepitus but no effusion. Record at 200. Evaluation for disability was delayed until after completion of physical therapy, scheduled to begin on September 21, 2004. Record at 201.

Progress notes dated September 21, 2004 show that Mr. Woodley was referred to outpatient rehabilitation for persistent pain. At that time, Mr. Woodley was described as having "good mobility and strength in both uppers. In the lower extremities, [he] noted no significant swelling or tenderness in either knee and noted full [range of motion] on both sides." Record at 201. While the doctor did recognize some weakness in the knee

16

extensors, he reported that there was no change in Mr. Woodley's gait to compensate for alleged pain. The report includes a plan for physical therapy. Record at 201.

The October 13, 2004 progress note signed by Physical Therapist Annie Aldea includes Mr. Woodley's report that his bilateral knee pain began a long time ago and has gotten progressively worse. Record at 202. Mr. Woodley reported that previous physical therapy did not improve his condition. Record at 202. In Ms. Aldea's progress note, Mr. Woodley describes that the pain is aggravated by walking, standing for long periods, and climbing stairs. For the first time in the medical record, Mr. Woodley explains that the pain is "managed with rest, lying down and sitting." And, for the first time in the medical record, he states that pain medications do not alleviate the pain. Record at 202. Ms. Aldea reported a slight swelling and a scar on the left knee, as well as crepitus and tenderness on both knees. Record at 203.

In order to achieve Mr. Woodley's stated goal "to get [his] knees better," Ms. Aldea planned physical therapy of exercise and heat packs twice per week for four weeks. Record at 203. Prior to beginning his physical therapy, Mr. Woodley returned to the VA orthopedics office and reported that the December 2003 surgery

helped him somewhat, but his right knee pain persisted. Record
at 209.

On October 20, 2004, according to Ms. Aldea's progress
notes, Mr. Woodley received physical therapy. Additionally, Ms.
Aldea provided a straight cane and instructions for its proper
use. Record at 210. Ms. Aldea's physical therapy treatments
included heat, stretching, and strengthening on October 20, 22,
27 and 29, 2004. Record at 210-212. At his fourth session of
physical therapy with Ms. Aldea on October 29, 2004, Mr. Woodley
reported that his knees were "getting better and stronger."
Record at 212. Mr. Woodley continued physical therapy in
November and December 2004, reporting that his knees were still
swollen, but that his knee was "getting better [and] stronger";
he represented that he thought he needed "more sessions of
therapy." Record at 246-251. The record indicates that Mr.
Woodley's final physical therapy appointment was December 17,
2004, at which time he reported that his knees were still
painful, rating the pain as a 5 on a 10-point scale. Record at
251.

On January 21, 2005, Mr. Woodley returned to the VA
orthopedics office, complaining of pain and occasional swelling
in both knees. Record at 251. In a Pain Assessment Report from
January 21, 2005 and signed by Michelle Lee-Sebastian, LPN, Mr.

18

Woodley rated his pain as an 8 on a 10-point scale; he described
the duration of the pain as "intermittent" and the quality of
pain as "burning." Record at 252. He also described his
inability to perform activities of daily living. He reported
that movement worsens the pain, and ibuprofen is ineffective for
pain relief. Record at 252-253. Progress notes signed by Bryce
A. Johnson, MD, on January 21, 2005, state Mr. Woodley "returns
today. He states that his knees are somewhat bothering him, but
he wants his disability filled out." The progress notes include
the determination that the exam was consistent with "djd,"
presumably degenerative joint disease. Dr. Johnson injected
steroids into each knee. Record at 255.

Mr. Woodley visited the VA General Medicine Outpatient
office for a routine appointment on May 19, 2005. Record at 255-
261. Progress notes from that date document Mr. Woodley's
request for disability. Mr. Woodley reported that he had not
worked in four years, and that due to his chronic knee pain, he
could walk only a block and sometimes uses a cane. Record at
258. The physical examination on May 19, 2005, revealed normal
strength and sensation in both knees, with very little fluid and
no point tenderness. Additionally, there was no pain with
passive range of motion tests. The progress notes describe
crepitus in the left knee, but none in the right. Record at 259.

19

The doctors noted that Mr. Woodley was "doing not so well" so they recommended continued treatment in the orthopedic clinic as well as continued use of Tylenol and NSAIDs, which include medications such as ibuprofen. Record at 259.

On October 20, 2005, Mr. Woodley returned to the VA General Medicine Outpatient office, complaining bout the pain in his knees. Record at 284-288. Progress notes from that date describe mild swelling of both knees, no obvious effusions, no point tenderness, no pain with passive range of motion tests, and normal strength and sensation. Record at 288. Dr. Leivant found crepitus in both knees, which was greater in the right knee. Record at 288. Dr. Leivant described Mr. Woodley's condition as patellofemoral degenerative joint disease, which caused "discomfort that is debilitating." Record at 288. Dr. Leivant placed an orthopedic clinic consult into the computer and recommended continued NSAID/Tylenol therapy, with the addition of Ultram for breakthrough pain. Record at 288. The final record in the VA's progress notes, dated November 7, 2005, records Mr. Woodley's follow-up visit to the orthopedics clinic, where Jason Ho, MD, injected both knees with steroids. Record at 290. Dr. Ho recommended a follow-up appointment in six months. Record at 290.

In addition to the progress notes from the VA, Mr. Woodley's medical records include a disability determination from the Illinois Department of Human Services Office of Rehabilitation Services, the state agency responsible for disability determinations ("state agency"). Record at 213. The state agency record includes a medical examination report prepared on March 5, 2003, by James R. Herron, MD, of Herron Medical Center, Ltd. Record 213-216. On March 4, 2003, Dr. Herron examined Mr. Woodley regarding his chief complaint of arthritis. Record at 213. Mr. Woodley told Dr. Herron that he had experienced pain in his knees, the left greater than the right, since 2000. Mr. Woodley complained of stiffness and said that the pain was constant and woke him up at night. He told Dr. Herron that he could walk a half block, and had been wearing knee supports for several weeks. Mr. Woodley also reported taking ibuprofen for his condition. Record at 213.

During the course of a full physical examination, Dr. Herron noted that Mr. Woodley was capable of dressing and undressing without assistance, getting on and off the examination table without assistance, and walking with a normal gait without the use of any assistive devices. Record at 214.

Dr. Herron's examination of Mr. Woodley's knees revealed no gross deformities, muscle atrophy, cysts, dislocation of the

patella, or ligament or meniscus rupture. Dr. Herron described mild crepitus and swelling of the left knee, and he found mild tenderness and decreased range of motion in both knees. The pain in both knees increased with movement and weight bearing. Record at 214-215. Dr. Herron measured the decreased range of motion, determining that Mr. Woodley had the normal 0 degree range of extension, but only 120 degrees of flexion compared with the normal range of 150 degrees. Record at 215.

The record also includes a Physical Residual Functional Capacity Assessment completed on March 10, 2003 by Dr. Reynaldo Gotanco. In this assessment, Dr. Gotanco determined that Mr. Woodley had the following exertional limitations: he could occasionally lift or carry items weighing 20 pounds; frequently lift or carry items weighing 10 pounds; stand and walk for at least 2 hours in an 8-hour workday; sit for a total of 6 hours in a normal workday, and push and pull without limit. Dr. Gotanco based his conclusions on the evidence of Mr. Woodley's bilateral knee pain. Record at 218. Dr. Gotanco also determined that Mr. Woodley could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but could never climb ladders, ropes, or scaffolds. Record at 219. Dr. Gotanco determined that Mr. Woodley had no manipulative, visual, communicative, or environmental limitations. Record at 220-221. According to the

22

assessment, Dr. Gotanco made his determination without a treating or examining source statement regarding Mr. Woodley's physical capacities. Record at 223. This is contradicted by Dr. Gotanco's notes, which indicated that he reviewed Dr. Herron's March 5, 2003 examination report. Record at 224. Dr. Gotanco concluded his assessment by noting that Mr. Woodley would be precluded from lifting any weight over 20 pounds due to his history of knee surgeries and pain. Record at 224.

The record includes a second medical evaluation done at the behest of the SSA. See Record 235-240. On April 23, 2004, Dr. Fauzia A. Rana examined Mr. Woodley, whose chief complaints at the time were pain in both knees and stomach ulcers. According to Dr. Rana's report, Mr. Woodley reported constant aching pain in both knees and intermittent swelling; he reported that he had difficulty walking more than one block and said that he used a cane on and off, depending on the pain. Record at 235. Mr. Woodley described knee stiffness and pain which worsened with damp weather; he also described an aching pain in his lower back. Record at 235. Dr. Rana reported that Mr. Woodley used Tylenol and ibuprofen. Record at 235. Through a complete physical exam, Dr. Rana concluded that Mr. Woodley's flexion of his knees was 120 degrees, his gait was normal, and his reflexes were normally active. Record at 237. Dr. Rana diagnosed impressions of

possible degenerative arthritis and peptic ulcer disease. Record at 237. Regarding Mr. Woodley's knees, Dr. Rana reported "no signs of acute inflammation or significant limitation of movement at present." Record at 237. An unsigned addendum to the report, dated May 12, 2004, indicates that Mr. Woodley did not bring a cane with him to his examination with Dr. Rana. Record at 240.

Dr. Virgilio Pilapil completed a second Physical Residual Capacity Assessment. Record at 227-234. The date of the assessment is unclear in the Record, but, given that it references Dr. Rana's April 23, 2004 examination, it obviously post-dates that exam.[2] Record at 234. Dr. Pilapil's assessment was identical to Dr. Gotanco's March 10, 2003 assessment, except that Dr. Pilapil determined that Mr. Woodley's ability to push and pull was limited in his lower extremities. Record at 228. In his additional comments section, Dr. Pilapil notes that Mr. Woodley claimed to have bilateral knee pain during any activity of daily living. Record at 234. Dr. Pilapil noted that Mr. Woodley is able to go up and down stairs, use public transportation, but uses a cane for walking and arising from bed. Record at 234. Dr. Pilapil summarized Dr. Rana's report,

---

[2] The handwritten date on the first and final pages appears to be April 12, 2004, but is not clearly legible in either instance. However, this date is clearly inconsistent with the information included in the report, such as the reference to Dr. Rana's April 23, 2004 examination of Mr. Woodley.

24

including the 120 degree range of motion, the normal gait, and
the lack of acute inflammation or limitation of movement. Record
at 234. Notably, Dr. Pilapil failed to include Dr. Rana's
diagnostic impression of possible degenerative arthritis. Record
at 234.

The ALJ issued his decision on August 14, 2006, finding that
Mr. Woodley was not disabled and denying his claim for benefits.
After considering the record, the ALJ found that Mr. Woodley had
"the residual functional capacity to perform sedentary work . . .
in an environment that permits him to sit or stand at will to
relieve pain, swelling, stiffness or other discomfort in his
knees." Record at 18.

The ALJ found that Mr. Woodley had degenerative joint
disease in the knees bilaterally, a severe impairment that
imposed "more than a slight limitation upon his ability to stand
and walk." Record at 17. The ALJ ruled that Mr. Woodley's
impairment could reasonably be expected to produce pain,
swelling, and certain limitations. But he found "that Mr.
Woodley's statements concerning the intensity, persistence and
limiting effects of these symptoms are not entirely credible."
Record at 18. The ALJ then reviewed Mr. Woodley's treatment
history, from the 1998 surgery to the November 2005 orthopedic
evaluation. Record at 18-19. The ALJ noted the gap in treatment

between 1998 and February 2003. Record at 18. And he described the results of Mr. Woodley's March, 5, 2003 physical exam as "no more than mild swelling and tenderness in the knees, a normal gait, and only slightly decreased range of motion bilaterally." Record at 18. The ALJ included the VA's diagnosis of patellofemoral degenerative joint disease. Record at 18. The ALJ noted that, in September 2003, Mr. Woodley told his medical providers that the pain only occurred when walking or climbing stairs, and that the swelling occurred after kneeling, as required by his occupation as a painter. Record at 18. The ALJ also described Mr. Woodley's December 2003 surgery and subsequent physical therapy, and he noted that Mr. Woodley reported improvements to his knees after the physical therapy in 2004. Record at 19. The ALJ noted that Mr. Woodley claimed that his knees were "somewhat bothering" him in 2005, but the final physical examination described only a slightly diminished range of motion of 130 degrees. Record at 19.

The ALJ described the inconsistency between Mr. Woodley's first Social Security application, in which he explained that he left his last job because his employer stopped giving him hours, and his later testimony at the hearing, which suggested that he also left because of his knee problems. Record at 19. The ALJ also noted that Mr. Woodley does not take medication to improve

26

his condition, and that he does not appear to need any kind of assistive device, having arrived at the hearing without a cane, for example. Record at 19.

The ALJ ruled that the medical records provide no evidence that Mr. Woodley needed to elevate his legs for several hours a day. Record at 19. The ALJ contrasted this lack of third-party support for elevation and rest to Mr. Woodley's own testimony that he walks to the local store up to three times a day to shop for his mother. Record at 19. Finally, the ALJ noted the state agency's determination that Mr. Woodley was capable of sedentary work. Record at 19.

The ALJ accepted Mr. Woodley's assertion that he needs to change his position often to alleviate pain and swelling, and he determined that a "sit/stand option appears in order." Record at 19. Based on this determination and the testimony of the VE that 3,500 sedentary jobs with a sit/stand option are available in the region, the ALJ concluded that Mr. Woodley "has been capable of making a successful adjustment to other work that exist in significant numbers in the national economy." Record at 20. He, therefore, found Mr. Woodley to be "not disabled." Id.

The ALJ's decision became the final agency decision when the Appeals Council denied review on November 27, 2006. See 20 C.F.R. § 416.1481. Mr. Woodley then filed this lawsuit, seeking

a review of the agency's decision and an award of benefits. The parties consented to proceed before a magistrate judge, and the case was reassigned to this Court on July 18, 2007. The parties then filed cross motions for summary judgment. Mr. Woodley asks the Court to reverse the Commissioner's denial of his claim for benefits, or, in the alternative, to remand the case to the Commissioner for further proceedings. The Commissioner asks the Court to affirm the decision to deny benefits.

## Discussion

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the

Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by "build[ing] an accurate and logical bridge from the evidence to [his] conclusion," so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

An individual claiming a need for DIB or SSI must prove that he has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("a listed impairment"); fourth, the ALJ must determine the claimant's residual functional capacity ("RFC"), and must evaluate whether the claimant can perform his past relevant work;

and fifth, the ALJ must decide whether the claimant is capable of performing other work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the ALJ. *Id*.

Applying this five-step analysis, the ALJ first determined that Mr. Woodley had not engaged in substantial gainful activity since the alleged onset date. Record at 17. At step two, the ALJ found that Mr. Woodley suffered from the impairment of degenerative joint disease in his knees bilaterally, and that the impairment was "severe" within the meaning of the Social Security Act and Regulations. Record at 17. However, the ALJ found that Mr. Woodley's condition did not meet or medically equal a listed impairment. Record at 18. At steps four and five, the ALJ determined that Mr. Woodley is limited to sedentary work "in an environment that permits him to sit or stand at will to relieve pain, swelling, stiffness or other discomfort in his knees." Record at 18. Based on that assessment, the ALJ determined that Mr. Woodley was incapable of performing his past work, which, according to the VE, ranged in exertional demand from light to heavy. Record at 19. The ALJ concluded, however, that given Mr. Woodley's age, education, work experience, and RFC, there were jobs that Mr. Woodley could perform that existed in significant

numbers in the national economy. Record at 20. Accordingly, the ALJ concluded, Mr. Woodley was not entitled to benefits.

Mr. Woodley argues that the ALJ's decision must be reversed or remanded for five reasons. He argues that the ALJ erred as a matter of law (1) by failing to justify his rejection of Mr. Woodley's testimony as incredible; (2) by failing to include a function-by-function assessment of Mr. Woodley's capabilities; (3) by substituting his opinion for that of a qualified medical expert; and (4) by failing to call a medical expert. Additionally, Mr. Woodley argues that the ALJ's decision is not supported by substantial evidence. The Court considers each argument in turn.

First, Mr. Woodley argues that the ALJ failed to justify the determination that his testimony was "not entirely credible." Mr. Woodley concedes that the ALJ's decision identified instances where he testified or acted inconsistently. But he argues that these inconsistencies are explained in his medical history, which clearly shows that his pain - and, therefore, his mobility and ability to function - fluctuated. Mr. Woodley relies upon his "numerous surgical procedures, physical therapy, and pain treatment regimens" as indications of the credibility of his testimony.

Because the ALJ, as the hearing officer, is in a better position to hear from a witness and assess his credibility, the Court will reverse the ALJ's credibility finding only if it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). While an ALJ's credibility determinations are generally entitled to deference, the ALJ must explain the findings in a way that affords meaningful review. *See Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002); Social Security Ruling 96-79 (1996). *See also Zblewski v. Schweiker,* 732 F.2d 75, 78-79 (7th Cir. 1983) (Courts must defer to an ALJ's credibility determinations only when explicitly made and explained; it is not "merely 'helpful' for the ALJ to articulate reasons (e.g., lack of credibility) for crediting or rejecting particular sources of evidence ... [i]t is absolutely essential for meaningful appellate review"). Social Security Regulation 96-7p requires that the ALJ's credibility determination must be supported by "specific reasons."

In this case, the ALJ listed numerous reasons for finding Mr. Woodley's testimony to be less than fully credible. Mr. Woodley's Social Security application and testimony were inconsistent: he first claimed that he left his last job because he was not scheduled for enough hours; only later did Mr. Woodley add the fact that he left his last job because of knee problems.

The ALJ also noted that Mr. Woodley sought no medical care for his knees for almost five years, and that his return to the doctor conveniently coincided with his first application for disability insurance benefits.

Additionally, the ALJ's decision describes specific inconsistencies at the heart of Mr. Woodley's claims: the intensity, persistence, and limiting effects of his condition. Mr. Woodley claimed that his pain and swelling required him to elevate his legs or lie down for long periods of time each day. The ALJ accepted the medical professionals' repeated diagnoses of real but mild limitations in range of motion and ability. However, as the ALJ pointed out, the medical records include no documented recommendations concerning elevation of the legs or lying down.[3] The medical professionals instead prescribed pain medication, but as the ALJ noted, Mr. Woodley does not take his prescribed medications, ostensibly because they are ineffective. And, as the ALJ pointed out, Mr. Woodley appeared at the hearing

_____

[3]The records show that Mr. Woodley reported to his doctor on March 3, 2003 that elevation provided minimal relief for his knees; additionally, on October 13, 2004, he told his physical therapist that he managed his pain with rest, lying down and sitting. Record at 159, 202. And no one is challenging the fact that elevation and rest may have helped to relieve his pain. But there is nothing in the medical records – even in those records reflecting Mr. Woodley's own reporting – to support the notion that he needed to elevate his legs and rest to the extent he indicated at the hearing (i.e., elevation for 5 hours per day and rest for 8 hours per day, plus another 8 hours of sleep per day).

without a cane and testified that he visited the local store up to three times daily. The lack of medical corroboration, combined with Mr. Woodley's apparent ability to get around quite adequately, led the ALJ to conclude that Mr. Woodley's testimony lacked credibility.

In short, the ALJ's credibility determination was neither patently wrong nor unexplained in his opinion. The Court finds that the ALJ satisfied his obligations under Social Security Ruling 96-7p by giving "specific reasons" for his credibility findings.

In his second argument, Mr. Woodley contends that the ALJ failed to comply with SSR 96-8p by failing to provide a function-by-function analysis in his opinion. Mr. Woodley asserts that the RFC assessment, which concluded that he was capable of sedentary work with a sit/stand option, was conclusory and should have included a function-by-function analysis of exertional and nonextertional factors. As an example, Mr. Woodley argues that the ALJ was required to assess and articulate his ability to bend and stoop.

The purpose of SSR 96-8p is to state the Social Security Administration's policies and interpretations of the RFC assessment. The introductory "Purpose" section of SSR 96-8p emphasizes that

34

> the RFC assessment must first identify the
> individual's functional limitations or restrictions and
> assess his or her work-related abilities on a function-
> by-function basis . . . . Only after that may RFC be
> expressed in terms of the exertional levels of work,
> sedentary, light, medium, heavy, and very heavy.

In the section entitled "Policy Interpretation," SSR-96-8p

defines RFC as "what an individual can still do despite his or

her limitations." To determine a claimant's exertional capacity,

SSR 96-8p requires that the seven strength demands of sitting,

standing, walking, lifting, carrying, pushing, and pulling "must

be considered separately (e.g., 'the individual can walk for 5

out of 8 hours and stand for 6 out of 8 hours'), even if the

final RFC assessment will combine activities (e.g., 'walk/stand,

lift/carry, push/pull')."

After describing the requirements of the RFC assessment, 96-

8p concludes with a section entitled "Narrative Discussion

Requirements," which describes the mandatory elements of an ALJ's

written RFC opinion. In general, the written narrative must

provide evidence to support the RFC conclusions regarding the

claimant's ability to work. Specifically, this section requires

that the RFC opinion:

> must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical
> facts (e.g., laboratory findings) and nonmedical evidence
> (e.g., daily activities, observations). In assessing RFC,
> the adjudicator must discuss the individual's ability to
> perform sustained work activities in an ordinary work

setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Mr. Woodley argues that the RFC narrative must describe the function-by-function analysis in detail, and that the ALJ failed to do so in his case. Some courts in this Circuit have agreed with Mr. Woodley's interpretation of SSR 96-8p's "function-by-function" language. In *Gotz v. Barnhart*, 207 F.Supp.2d. 886, 897 (E.D. Wis. 2002), for example, the court ruled that the ALJ must consider and discuss all seven of the exertional factors defined in 96-8p, including the abilities to sit, stand, walk, lift, carry, push, and pull. There, a claimant suffering from fibromyalgia, migraine headaches, and other ailments argued that the ALJ erred by failing to list physical requirements of her past work and whether she could meet them. *Id.* at 894. The court agreed, citing SSR 96-8p and noting that the ALJ's "discussion of the plaintiff's exertional capacity omitted specific evaluation of plaintiff's ability to lift, carry, push and pull . . . . On remand the ALJ must consider all seven factors." *Id.* at 897.

This interpretation has been adopted by at least one judge in this district. In *Unger v. Barnhart*, 507. F.Supp.2d 929, 938

(N.D. Ill. 2007), a claimant suffering from skeletal deformities argued that the RFC determination was flawed because the ALJ failed to perform a function-by-function analysis of her ability to perform work-related activities. Agreeing with the claimant, the court ruled that SSR 96-8p requires the ALJ to "separately consider and discuss the Claimant's ability to perform each of the seven strength demands-sitting, standing, walking, lifting, carrying, pushing, and pulling-on a 'regular and continuing basis' of eight hours a day, five days a week." *Id.* at 941.

Other courts have rejected this interpretation, however, and instead drawn a distinction between the function-by-function analysis and the narrative requirements described in SSR 96-8p. These courts have ruled that SSR 96-8p requires ALJs to *consider* claimants' abilities on a function-by-function basis, but the regulation does not require ALJs to *specifically discuss* every detail of these considerations in their written opinions.

In *Morphew v. Apfel*, No. IP 99-655-C H/G, 2000 WL 682661, at *3 (S.D. Ind. Feb. 15, 2000); 69 Soc. Sec. Rep. Serv. 164, for example, a claimant suffering from arthritis and alcoholism argued that the ALJ reviewing his disability claim failed to articulate a function-by-function analysis. The court disagreed, and ruled that "[t]here is a distinction between what the ALJ must consider and what the ALJ must articulate in the written

opinion." *Id.* at *3. The court analyzed SSR 96-8p and its "Narrative Discussion Requirements" and found that:

> SSR 96-8p does not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis. Rather, an ALJ must explain how the evidence supports his conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities. *Id.*

*Lawson v. Apfel*, No. IP 99-1112-C H/HG, 2000 WL 683256, at *3-4 (S.D. Ind. May 25, 2000); 69 Soc. Sec. Rep. Serv. 141, holds much the same; in that case, a claimant who suffered from back pain and depression argued that the ALJ's decision must include a function-by-function articulation. As in *Morphew*, the district court rejected this construction of 96-8p. *Id.*

Similarly, in *Corder v. Barnhart*, No. 03 C 9308, 2004 WL 1381125, at *5 (N.D. Ill. May 10, 2004); 97 Soc. Sec. Rep. Serv. 507, a claimant with lower back pain argued that the ALJ failed to comply with 96-8p by not describing in detail his ability to sit, stand or walk. The court ruled that "SSR requires the Commissioner to 'consider,' not articulate [a claimant's] residual functional capacity on a function-by-function basis." *Id.* at *6. The court found, however, that if a claimant's specific abilities to sit, walk, or stand were compromised, the opinion should include a description of these limitations. *Id.*

In *Lewis v. Astrue*, 518 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007), the court cited *Corder* and noted that "SSR 96-8p does not mandate a function-by-function articulation requirement." In *Lewis*, a claimant suffering from diabetes and numerous related conditions argued that the ALJ's RFC assessment must include a narrative discussion of each functional consideration. *Id.* As in *Corder*, the court ruled that the ALJ must include a narrative discussion only after determining that a claimant's specific abilities, such as standing or walking, are compromised. *Id.*

Having carefully considered the cases on both sides of this issue, the Court is persuaded that the RFC analysis and narrative are distinct; while an ALJ's written opinion must provide evidence to support his RFC conclusions, the opinion need not include a specific recitation of every detail of the function-by-function analysis. In this case, the ALJ concluded that Mr. Woodley had "more than slight" limitations on his abilities to stand and walk. Record at 17. Thus, in his RFC assessment, the ALJ was required to include a narrative discussion of these specific limitations, and he did so. Addressing Mr. Woodley's symptoms, the ALJ's RFC assessment included a thorough review of the medical and non-medical evidence, Mr. Woodley's complaints of pain and other symptoms, and the ALJ's personal observations. Record at 18-19. The narrative addressed the inconsistency of Mr.

Woodley's testimony with other evidence, and set forth a logical explanation of the effects of Mr. Woodley's condition. Record at 18-19. The ALJ incorporated the two assessments provided by the state agency, both of which concluded that Mr. Woodley was capable of sedentary work. Record at 19. After reviewing all of this information, the ALJ concluded that Mr. Woodley's compromised ability to stand and walk limited him to sedentary work "in an environment that allows him to sit and stand at will to relieve pain, swelling, stiffness or other discomfort in his knees." Record at 18. Because his RFC assessment did not include any further limitations, the ALJ was not required to articulate or describe any additional limitations in his decision.

In his third argument, Mr. Woodley contends that the ALJ erred as a matter of law by substituting his judgment for that of a qualified medical expert. Specifically, Mr. Woodley argues that the ALJ substituted "his lay opinion regarding the residual functional capacity of an individual with bilateral knee impairments and the pain and limitations associated with such impairments."

The Social Security Regulations directly address Mr. Woodley's claim. 20 C.F.R. §404.1527(e) reserves certain findings to the SSA and the Commissioner, explicitly stating that these findings are "not medical opinions." Section

404.1527(e)(2) clearly explains that the SSA will consider opinions from medical sources when determining a claimant's RFC, but that the final responsibility for the decision "is reserved for the Commissioner." 20 C.F.R. § 404.1545(a)(3) describes the claimant's and the SSA's mutual responsibilities for providing a complete medical record from which to determine the RFC. But the regulation does not require that medical experts play any role in the final RFC decision.

In this case, the ALJ met his obligation when he limited Mr. Woodley's RFC to sedentary jobs with a sit/stand option. While no medical expert was required to make this finding, the ALJ noted that the state agency and its consultants reviewed the medical record and also determined that Mr. Woodley was capable of sedentary work. The Court finds that the ALJ committed no error in this regard and did not improperly substitute his opinion for that of a medical expert.

In his fourth argument, Mr. Woodley claims that the ALJ was required to obtain an updated medical opinion to determine whether his condition was medically equivalent to one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1. Mr. Woodley argues that, because he had problems in both knees, his condition was likely medically

equivalent to a listed impairment, and the updated opinion of a medical expert was necessary to make this determination.

20 C.F.R. § 404.1527(f)(iii) states that an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) and on whether [the] impairment(s) equals" a listed impairment. SSR 96-6p explains that an updated medical expert opinion is required in two cases: first, when the ALJ believes that the "symptoms, signs, or laboratory findings in the case record suggest that a judgment of equivalence may be reasonable"; and second, when additional medical evidence is received that the ALJ believes "might change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent" to a listed impairment. Here, neither is true.

First, the ALJ did not believe that Mr. Woodley's symptoms, signs, or laboratory finding indicated equivalence with a listed impairment. To the contrary, at step 3, he ruled that Mr. Woodley's condition did not equal a listed impairment. Second, reviewing Dr. Pilapil's determination that Mr. Woodley's condition did not equal a listed impairment, the ALJ analyzed nearly twenty months' worth of additional medical evidence that followed. The medical records from May-December 2004 and from January-November 2005 do not describe significant changes in Mr.

Woodley's complaints or treatments, and describe some improvements in his condition during physical therapy. Thus, the ALJ reasonably believed that this additional evidence did not warrant a change in the state examiner's listed impairment determination. Under the circumstances, an updated medical expert opinion was not required.

Finally, Mr. Woodley argues that the ALJ's decision is not supported by substantial evidence. To support this claim, Mr. Woodley describes his long history of bilateral knee problems, medical treatment, and chronic pain. He emphasizes his need to elevate his legs for 4 to 5 hours each day and to lie down for 6 to 8 hours each day. He notes that the sedentary jobs with the sit/stand option described by the VE would not allow more than minimal elevation and would not allow any lying down during the day. Based upon this, Mr. Woodley argues, the ALJ's conclusion that he was capable of sedentary work with a sit/stand option was not supported by substantial evidence; "at the very least," he argues, the ALJ should have consulted a medical expert to determine whether his condition was equivalent to a listed impairment.

As explained above, in reviewing the ALJ's decision, the Court may not decide the facts, re-weigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v.*

*Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). Mr. Woodley's final argument would require the Court to do so.

The Court finds that the ALJ appears to have considered the entire case record, including the hearing testimony of Mr. Woodley and the VE, the multi-year medical record, and the findings of the state agency. In his decision, the ALJ built an accurate and logical bridge by providing a rationale for accepting the fact that Mr. Woodley is limited to sedentary work while rejecting the claim that Mr. Woodley is disabled. He described Mr. Woodley's alleged need for elevation and rest, but concluded that Mr. Woodley was not entirely credible and that the medical records did not support this claim. The ALJ described Mr. Woodley's ongoing complaints and treatment, and ruled that he was indeed limited by degenerative joint disease in the knees bilaterally. Because of this, the Court finds that the ALJ fulfilled his obligation, and Mr. Woodley's final argument is rejected.

## Conclusion

The Court's review of the ALJ's decision and the Record indicates that the ALJ carefully weighed all of the evidence in the record and the testimony at the hearing. There is no indication that the ALJ was unfair, or ignored evidence favorable to Plaintiff's claim of disability. The ALJ adequately described

44

the relationship between the evidence and his conclusion that
Plaintiff is capable of performing sedentary work with a
sit/stand option.  And his findings are supported by substantial
evidence.  Accordingly, the Court denies Plaintiff's Motion for
Summary Judgment [#14] and grants the Commissioner's Motion for
Summary Judgment [#20].

Dated: April 23, 2008

ENTER:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge